MORGAN et al. v. NORTHERN PAC. RY. CO.

(Circuit Court of Appeals, Ninth Circuit. May 20, 1912.)

No. 2,099.

**1.** RAILROADS (§ 381*)—OPERATION—INJURIES TO PERSONS ON TRACK—CONTRIBUTORY NEGLIGENCE.

A pedestrian on a very dark and windy night went on a railroad roadbed between tracks on which a train was liable to come at any time, and he later went from that place, which was probably safe from moving trains, to the middle of one of the tracks and was struck by a train. Had he looked, he would have seen the light of the engine of the train. His companions saw the light and told him of it, and one of them advised him to get off the track, while the other said that no train would come down the track. The train that came on the track was ordinarily operated on the other track. *Held*, that the pedestrian was guilty of contributory negligence as a matter of law.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1285–1293; Dec. Dig. § 381.*]

**2.** RAILROADS (§ 383*)—OPERATION—INJURIES TO PERSONS ON TRACK—CONTRIBUTORY NEGLIGENCE.

One who voluntarily places himself in such a dangerous place as between the rails of a railroad track is chargeable by law with the duty of looking and listening for trains that may be coming from either direction, and such duty is enhanced when the night is very dark and a strong wind is blowing.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1305–1310; Dec. Dig. § 383.*]

In Error to the Circuit Court of the United States for the Western Division of the Western District of Washington.

Action by Daisy Morgan, on the part of herself, and William Morgan and others, minors, by their guardian ad litem, Daisy Morgan, against the Northern Pacific Railway Company. There was a judgment for defendant, and plaintiffs bring error. Affirmed.

This was an action by the widow and minor children of Charles Morgan, who was killed by one of the railway trains of the defendant in error. The accident occurred about 11 o'clock on the night of January 29, 1910, between South Tacoma and Tacoma, in the state of Washington, between which points the railroad company had a double track. Morgan resided on Junette street, in the city of Tacoma, and, according to the uncontradicted evidence, to reach his home the customary way and the only practical method of travel was to take the Center street or Jefferson avenue car line to the terminus of the line, and from there to walk to his home by a regular path which led from the end of the street car line directly to the railway tracks of the defendant in error. It was the custom, and had been for many years, of the people who lived in the neighborhood where Morgan did, to take the path referred to to the roadway of the defendant in error, and then follow that down to another trail which led to their homes. The evidence shows without conflict that on an average from 40 to 50 people, including Morgan, had been accustomed to use that route day and night for a great many years, and that the defendant railway company never objected thereto. Morgan was using that route at the time that he was killed, and must therefore be regarded as a licensee and not as a trespasser. The evidence shows without conflict that the custom of the railway company was to send its trains into the city of Tacoma over the east-bound track and to send its trains going out of the city over the west-bound track, but that on the night in question the train that killed Morgan was directed to take the west-bound track at South Ta-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

coma, and was on that track at the time of the accident. It further appears without conflict in the evidence that the night in question was very dark and was windy, and it had been raining; that with Morgan there got off of the street car a Mrs. Doty and her daughter, who were neighbors of the deceased; and that the three started for their respective homes together and along the route that has been indicated. The record shows that 814 feet from where the trail from the end of the street car line strikes the railroad track there is a switch leading to the Willamette Casket building, and that from where that switch starts to the west end of the building is about 300 feet, and from the west end of the building to the Pine street crossing at South Tacoma is about 1,200 feet, and that at the Pine street crossing there is a two-degree curve in the railroad tracks, and that from the curve to the first trail mentioned the railroad tracks are practically straight. Morgan being dead, Mrs. Doty and her daughter were the only witnesses, so far as appears, to the accident, unless it be those who were upon the engine.

The locomotive engineer was called as a witness on behalf of the plaintiffs, and testified as follows:

"I am a locomotive engineer in the employ of the Northern Pacific Railway Company and have been for the past 12 years. In January of last year, my run was between Tacoma and Centralia. The fireman was Holm. On the night of the 29th of January, 1910, I was coming in from Centralia on a freight train. The train consisted of three cars and a caboose. At South Tacoma, my orders were to use the west-bound main line between South Tacoma and Tacoma. It has not been the custom in coming in to use the west-bound track. Between South Tacoma and Tacoma, it is about level, and I was running about 20 miles per hour, and I made no stops between South Tacoma and Pacific avenue."

Cross-examination: "I first learned that I had struck Morgan the next morning. The west-bound track coming in is the track next to the casket factory, the left-hand track coming the way I was coming. That is the only way that we can get in when the other track is blocked. The engine was running front end first."

The fireman was not called as a witness.

Mrs. Doty testified, among other things, as follows: "My daughter and I got off the car at that point (Jefferson avenue), and Mr. Morgan waited at the path for us to come up with him, and so we all walked together. We took the path leading from the car line to the Northern Pacific tracks. It was about 11 o'clock when we got off the car. The night was very dark and cloudy. It had been raining in the city, but it was not raining when we walked up the track. I could not see more than about 10 feet, I guess; it was very dark. * * * My daughter was on the outside, I was next, and Mr. Morgan was on the outer side in the west track, for a ways."

The witness testified that Morgan first walked between the two tracks, her daughter walking outside of the tracks and a little in advance, and the witness a little in the rear of Morgan, and that Morgan later stepped over into the middle of the west track. "We were not talking," said the witness, "and being so dark, and I was not much acquainted with him, only knew him as a neighbor, and we had nothing to say, and just walked along quietly, when I happened to look up, just happened to look, and saw a dim light, and I knew that it was a moving light, and I remarked to Mr. Morgan, 'Mr. Morgan, you had better get off the track.' and that moment or second my daughter turned around to me in her path and says, 'Ma, you know the train don't come down this track,' and she traveled the track so much more than I have that she knew positively the train would not come down that track because it never had, and while she spoke the train rushed by and Mr. Morgan was struck. When the train rushed by, I was at about the south end of the casket factory, the farthest end from Jefferson avenue car line."

The witness further testified that she was sure that the train never made any sound of any sort. Being asked whether it had a headlight, the witness answered:

"It had a light. I can swear it had a light. It was not a good light, because the lights that were usually on the trains scare me.

"Q. Did you see any flash of light along the rail? A. No flash at all. I

have seen headlights of engines many times. This light might be as large as one of these globes (indicating electric light globes in courtroom), but it was dim; it was not bright; it did not flare up like a light of that kind ought to. Of course, it might be bigger than an electric light globe, but I should judge something like it. The train did not sound any bell. My daughter, as the train flew by, went down the embankment. I have seen trains running by here right along. This train was going awfully fast; faster than any train I ever saw go."

On cross-examination the witness testified that at the time Morgan was struck he was walking in the middle of the track; that she did not hear the train coming, but saw the moving light first; that the train was already around the curve when she first saw it. "It was on a straight line," said the witness. "It was a very bad night. The wind was blowing some. I was walking most of the time with my head down, just as one naturally would. It was not windy enough for me to say it was a very windy night. It was a very dark night. It had rained in the city a little. * * * When I saw that light, I took it to be the light of the train and thought the engine was coming on that track. I remarked to Mr. Morgan, 'Better get off the track.' My daughter was ahead of me at the time, just a little in advance of me. I do not remember whether he said anything or not. If he did, I did not hear him. My daughter turned around and said I know the trains did not come down that track.

"Q. Did you say anything in reply to your daughter? A. I didn't have time, sir.

"Q. Just about that time? A. The train flew by. The train was coming toward me. The light was about the size around of one of these electric globes here in the room. It was a very dim light."

Myrtle Doty, the daughter, testified, among other things, as follows:

"We all three of us walked in the track as we crossed the switch. Just as we crossed the switch, Mr. Morgan stepped off between the two double tracks, and then I stepped off on the outer side. I told Mamma she had better walk over there, too, because it was better walking. I hardly ever walk between the rails of the track. That is one reason I told Mamma to step off. Then we walked on, I must have been about 10 feet ahead of Mamma, maybe a little more, and after a while Mr. Morgan stepped over in the track. That brought him nearer to me. I think Mamma made some remark, I am not sure, because I was ahead, and I am not sure whether they were talking or not; but as we were going along Mamma says, 'Mr. Morgan, you had better get off that track.' We were about midway between the center of the casket factory and the end. I understood Mr. Morgan to say something about trains coming down that track too, and then I turned around, and I says: 'No, Mamma, you know the trains don't come down this track. I never saw them come down it.' And just as I finished saying that I looked up and the train was right on to me. The train rolled past me, I think, before I got off the track. It was going so awfully fast; I never saw a train going so fast. It never whistled or rung any bell. There was a headlight on the train, but it was the dimmest one I have ever seen. There was no flash along the rails like the big headlights have, just as I saw the light. I saw the rails directly in front, but just a short distance from the engine."

On cross-examination this witness testified:

"I told Mr. Morgan that the wind was blowing so hard in my face it was difficult to carry on a conversation, which is a fact, as it is always blowing down the track. I turned around to speak to Mamma as I naturally would.

"Q. What caused you to remark, 'Better get off the track'? A. Mamma said she saw the light.

"Q. And then she mentioned the fact better get off the track? A. Yes, sir.

"Q. Did Mr. Morgan get off the track? A. He did not have time.

"Q. He did not have time after your mother made that remark? A. No, sir.

"Q. You had time to turn around and say the trains don't come down this track? A. Yes, sir; as soon as I said that, the train was right there. I

had no more than said it than the train was on me, and there was not time for Mr. Morgan to get off the track.

"Q. And you saw it as it went by, or before it came to you? A. Just before it got to me, I saw the light, but it was too—

"Q. What? A. I saw the light, and I had no more than seen it before it was past me. I think I could have seen the light as it came around the curve, if I was looking that way; but I was holding my head down, and I turned to speak to Mamma. She had spoken to me about the train, and that was what first attracted my attention to the train."

The locomotive engineer, being recalled by the defendant company, testified that on the night of the accident "the engine had an oil lamp for a headlight. That is the character of light that has been used for a number of years. Later years we have the electric lights. At that time it was the customary light, and has been ever since the locomotive was built. That night, it was dark and cloudy, and the wind was blowing, and it was raining. The rain did not have any particular effect on the engine, except to cover the outside glass with drops of water, and that of course dims the light so that it don't shine as well as though there was no water on the glass. I was in the cab on the right-hand side. I did not see anything of the deceased or any person on the track at that time. My attention is sometimes diverted to the engine, but not to any great extent. On plaintiffs' Exhibit A between the casket factory and Pine street crossing, what is marked 'W' is a whistling post. That is for use in going west, out of town, towards South Tacoma from here. That does not indicate for a train coming in to whistle. On the opposite side of Pine street there is a whistling post. This is about a quarter of a mile away, before we reach that crossing. The bell of my engine was ringing. We have an automatic bell ringing, and they are always ringing in yard limits or approaching railroad crossings or street crossings at grade. We have an automatic bell ringer. As a rule that is turned on when we leave South Tacoma, or approach road crossings. When we whistle for road crossings, we generally turn the little valve to set the bell going. When an engine is approaching, say, at 20 miles an hour, the person in front of the engine, that is, in the direction in which the engine is going, can hear the bell. It sounds better after the train had gone by, but it is for a warning of an approaching train."

In reply to a question by one of the jurors, the witness testified further: "If the reflector of that light was clean and in good condition and the light was burning bright, I could discern an object about 12 car lengths. I could not say whether or not I could have seen any one if my light had been in first-class condition, probably could about 8 to 12 car lengths. I was looking out; my attention is never diverted to the machinery of the engine for more than an instant. It only takes an instant to gauge the amount of water in the boiler. In that time, I might travel four or five car lengths."

Upon the conclusion of the evidence in the case, the counsel for the defendant company requested the court to direct a verdict in favor of the defendant, to which the court replied: "I have always made it a rule never to try one of these damage suits but once. I am under the impression that a jury will find it very difficult to bring in a verdict for the plaintiffs in this case if they follow my instructions, but I will submit the case to the jury"— to which action the defendant reserved an exception. The court thereupon charged the jury, which returned a verdict for the plaintiffs in the sum of $7,000. Thereafter the defendant moved for judgment in its favor, notwithstanding the verdict, which motion the court granted and entered judgment for the defendant, to which action the plaintiffs reserved an exception, and brought the case here by writ of error.

Hayden & Langhorne and Ray & Dennis, all of Tacoma, Wash., for plaintiffs in error.

Reid, Quick & Da Ponte, all of Tacoma, Wash., for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

ROSS, Circuit Judge (after stating the facts as above). [1] Manifestly, the action of the court below was, and only could have been, based on the view that the deceased was, according to the uncontradicted evidence, guilty of such contributory negligence as, under the law, precluded any recovery on account of his death.

The question therefore is: Did the evidence show without conflict that the deceased was guilty of contributory negligence? We feel bound to hold, as did the court below, that it does. Without conflict it shows that he went upon the roadbed between the tracks on which a train was liable to come at any time, and walked along it in the direction from which the train did come, the light of the engine of which both of his two companions saw, and which he should have seen, and doubtless would have seen, at the same time if he had been looking ahead as they were. And even when told by his companion, Mrs. Doty, that he had better get off the track, he made no effort in response to the warning to do so, so far as appears from the testimony of either of the two witnesses at the time present. It is true they both say in their testimony that the deceased did not have time to get out of the way; yet it is obvious, we think, from the testimony of those witnesses, that their conclusion in that respect is erroneous. Mrs. Doty, who is corroborated by her daughter, states that when she saw the light she knew it was a moving light, and that she then said to the deceased, "Mr. Morgan, you had better get off the track," and that her daughter turned around in the path she was walking, and said to her, "Ma, you know the train don't come down this track." Surely this afforded the deceased ample time within which to step beyond the rails and danger. It is altogether probable that he acted on the daughter's statement that the trains did not come down that track; but he had no right to do so. Which of the tracks would or should be used for its various trains was, of course, a matter for the exclusive determination of the railroad company. Besides, the deceased should not have gone upon the roadbed at all; nor was there any need for him to have done so. The girl was walking on a beaten path outside of the roadbed, and testified, in effect, that she was afraid to walk between the rails. And so the deceased should have been—particularly on such a night as the one in question. At first, according to the testimony, he did not do so, having walked in the space between the two roadbeds, and where, it is probable, he would have been safe from the passing train; but unfortunately he made the fatal mistake of going from that place to the middle of the west track, where he met his death from the oncoming train.

[2] One who at any time voluntarily places himself in such a dangerous place as between the rails of a railroad is certainly chargeable by the law with the duty of looking and listening for trains that may be coming from either direction, which duty was greatly enhanced on the occasion in question, when, according to the evidence, the night was very dark and a strong wind was blowing. In a similar case before this court a few years ago (Northern Pacific Railway Co. v. Jones, 144 Fed. 47, 75 C. C. A. 205), we said:

"A general license to the public to walk upon a railroad track does not mean that the railroad company is to be the insurer of the safety of all per-

sons who avail themselves of that permission. While the license adds to the responsibilities of the railroad company, and imposes upon it a greater burden of care, it does not affect the duty that rests upon the licensee to take all due precautions to avoid injury to himself. If the negligence of the defendant in error was one of the proximate causes of the injury which he sustained, if it directly contributed to the unfortunate result, he cannot recover, even though the negligence of the plaintiff in error contributed to it; and the rule is the same whether the injured person be a trespasser on the railroad track or a licensee."

Many cases are there referred to, to which reference need not be again here made.

For the reasons stated, the judgment is affirmed.