LESSIE HORTON v. SEABOARD AIR LINE RAILROAD COMPANY.

(Filed 8 May, 1918.)

1. **Master and Servant—Negligence—Assumption of Risks—Contributory Negligence—Employer and Employee.**

    The doctrine of assumption of risks by the servant engaged in a dangerous employment arises by contract, and does not embrace an injury received through the negligence of the master in failing to perform a distinctive duty that he owes to the servant therein engaged; and where through the negligence of a railroad company some of its box cars became loose and ran into its freight train, injuring the conductor thereon, evidence that the conductor was running his train without a headlight in violation of a statute, riding at the time in a caboose car which he had placed in front of the locomotive, and might not have been injured if it had been properly placed in the train, bears on contributory negligence to be considered by the jury in diminution of the damages under the Federal Employers' Liability Act.

2. **Master and Servant—Negligence—Contributory Negligence—Statutes—Trespassers.**

    The conductor on a railroad train does not become a trespasser to whom the company owes no duty except to refrain from willful injury by running his train without a headlight in violation of a statute.

3. **Master and Servant—Federal Employers' Liability Act—Damages—Dependents—Issues—Statutes.**

    In an action to recover damages under the Federal Employers' Liability Act for the legal dependants of an employee suffering injury or death through the negligence of a railroad company while engaged in interstate commerce at the time of such injury, each of the beneficiaries coming

HORTON *v.* R. R.

within its provisions is entitled to recover the pecuniary benefit he or she may have sustained from the negligent act, and issues as to the amount as to each, should be submitted to the jury. Our State Statutes, Revisal, secs. 59-60, relating to a recovery by a personal representative of the deceased for a wrongful death, have no application. *In re Stone,* 173 N. C., 208, cited and distinguished, and the dictum therein overruled.

4. **Master and Servant—Federal Employers' Liability Act—Instructions—Damages—Appeal and Error.**

Upon the measure of damages to be awarded to the dependent children of an employee of a railroad company, killed by the negligence of the company while he was engaged in interstate commerce, a charge is proper that the jury should award to each such an amount as the deceased would reasonably be expected under all the facts and circumstances in the case to have contributed to the maintenance and education of the child, the loss sustained being peculiarly its own and including a recovery for the loss of that care, counsel, training, and education which the child might, under the evidence, have received from the parent, and which only could be supplied by the services of another by compensation; and where it is necessarily implied from the language used, that it is limited to the minority of such children, it will not be held objectionable as not restricting the maintenance allowable to their minority.

WALKER, J., dissenting; BROWN, J., concurs in this dissent.

APPEAL by defendant from *Long, J.,* at October Term, 1917, of UNION.

This is an action of damages for wrongful death under the Federal Employers Liability Act. The plaintiff's intestate was killed at 4 a. m., 9 February, 1917, in a wreck between Monroe and Wingate about a mile east of Monroe. Said intestate was conductor on the westbound freight train and was proceeding towards Monroe. He had placed a caboose and tank car in front of the engine and was pushing them and pulling 36 freight cars when 21 heavily loaded freight cars which had gotten loose at Monroe rolled down the grade, striking his train, and killing plaintiff's intestate.

The following issues were submitted:

1. Was the plaintiff's intestate killed by the negligence of the defendant, as alleged in the complaint? Answer: "Yes."

2. Did the plaintiff's intestate, by his own negligence, contribute to his death, as alleged in the answer? Answer: "Yes."

3. Did the plaintiff's intestate, by his own conduct, assume the risk of being killed by the collision between his train and the runaway cars, as alleged in the answer? Answer: "No."

4. What damage, if any, is the plaintiff entitled to recover for herself as the widow of her intestate? Answer: "$10,000."

5. What damage, if any, is the plaintiff entitled to recover for the infant, Gus Horton? Answer: "$5,000."

6. What damages, if any, is the plaintiff entitled to recover for the infant, Annie Horton? Answer: "$5,000."

To which the jury responded as above set out.

Judgment was rendered upon the verdict, from which defendant appealed.

*Stack & Parker for plaintiff.*

*Cansler & Cansler, Armfield & Vann, and John M. Robinson for defendant.*

CLARK, C. J. The defendant does not discuss in his brief Exceptions 3, 5, 6, 7, 11, and 12, which, therefore, under Rule 34, are deemed abandoned.

The plaintiff alleged that the death of her intestate was caused by the negligence of the defendant (1) in allowing loaded freight cars to run down its main line without any one in charge to exercise control over them; (2) in making up a train upon its main line upon a steep grade, and in allowing loaded freight cars to stand upon the grade without brakes being properly applied; (3) in violently bumping cars left upon the grade; (4) in equipping the cars which broke loose with defective couplers.

There was evidence tending to support these charges of negligence and the court properly instructed the jury in regard thereto.

The fourth assignment of error is that the court charged as follows: "If the jury find from the evidence that the wreck which caused the death of the plaintiff's intestate was solely and proximately caused by the negligence of defendant's servants in not properly applying brakes on cars standing on its main line on a grade, the jury are instructed that the risk of this negligence was not assumed by the deceased in allowing the caboose in which he was riding to be pushed by the engine, even if the deceased would have escaped injury if the caboose had been behind the engine instead of in front of it."

In this we find no error. The doctrine of assumption of risk is that an employee assumes the risk of accidents and injuries incident to the business properly operated. He does not assume the risk caused by the negligence of the company, in not furnishing proper appliances or in any other respect. In this case the jury have found that the death of the intestate was due to the negligence of the defendant in the particlars above set forth. If the plaintiff in any respect contributed thereto by putting the caboose and tank car in front of the engine, this was not assumption of risk, but was contributory negligence, and though it is not clearly apparent that this action contributed to the collision with the runaway cars, the jury have so found, and neither party has appealed

on that ground, and the jury have apportioned the damages under the Federal statute. Such contributory negligence was the act of the intestate and not a risk of the business which he assumed.

In *R. R. v. Campbell,* 241 U. S., 497, the Court said: "It is most earnestly insisted that the findings established that Campbell was not in the course of his employment when he was injured, and consequently that judgment could not properly be entered in his favor upon the cause of action established by the general verdict. This invokes the doctrine that where an employee voluntarily and without necessity growing out of his work abandons the employment and steps entirely aside from the line of his duty, he suspends the relation of employer and employee and puts himself in the attitude of a stranger or a licensee. The cases cited are those where an employee intentionally has gone outside of the scope of his employment, or departed from the place of duty. The present case is not of that character. . . . We are not aware that in this case it has been seriously contended that because an engineer violated his orders he went outside of the scope of his employment."

Conceding that the conduct of the deceased was in violation of State law because the intestate, who was a conductor, was running the train without the headlight displayed as required by State law, he did not thereby become a trespasser to whom the defendant owed no duty save to refrain from willful injury. His conduct, at most, as between him and his employer was contributory negligence, which the jury have found. In the case just cited the United States Supreme Court held that though Campbell was guilty of a criminal offense in violation of State law, "his right to recover against his employer depends upon the acts of Congress, to which all State legislation affecting the subject-matter must yield," citing *R. R. v. Riggsbee,* 241 U. S., 33.

The deceased was not a trespasser, but was an employee engaged at the time of his death in the discharge of his duty, and if guilty of negligence in the make-up of his train, the damages have been diminished on account of that negligence by the provision of the Federal Employers Liability Act that the negligence of an employee should not defeat but merely diminish the recovery.

There is a vital difference between contributory negligence and assumption of risk, which is thus stated, 1 Labatt on Master and Servant, secs. 305 and 306, as follows: "Assumed risk is founded upon the knowledge of the employee, either actual or constructive, of the risks to be encountered, and his consent to take the chance of injury therefrom. Contributory negligence implies misconduct, the doing of an imprudent act by the injured party, or his dereliction in failing to take proper precaution for his personal safety. The doctrine of assumed risk is founded upon contract, while contributory negligence is solely matter of conduct.

This distinction has often been approved by the United States Supreme Court in cases under the Employers' Liability Act. *R. R. v. Horton,* 233 U. S., 492; *R. R. v. Wright,* 235 U. S., 376.

The distinction is well stated in Richie "Federal Employers' Liability Act" (2 Ed.), 169, as follows: "Though an employee is said to assume the risk of the consequences resulting from a violation of rules, this is properly contributory negligence. And an employee in view of severe weather conditions is guilty of contributory negligence and does not assume the risk when he fails to protect the rear of his train by proper signals, though warned by the following engineer that it was impossible to see the block signals and told to do a good job of 'flagging.'"

Exceptions 8 and 9 are as follows:.

8. "If you answer this third issue (assumption of risk) 'Yes,' the plaintiff cannot recover at all."

. 9. "In this connection I will say to you that 'assumed risk' is founded upon the knowledge of the employee of the hazards to be encountered and his consent to take the chance of injury therefrom."

We find no error in these instructions, which require no discussion.

The intestate left a wife and two children, and Exceptions 1 and 2 are to the court submitting an issue as to damages sustained by each of the three beneficiaries for whom the action was brought.

At the time of his death the deceased was engaged in discharging the duties of a freight conductor on one of the defendant's freight trains engaged in interstate commerce, as is admitted in the defendant's brief, and this action was brought under the Federal Employers' Liability Act.

There is a radical difference between the wrongful death statute of North Carolina, Revisal, 59, and the provision of the Federal Statute under which this action is brought. Revisal, 59, provides that the action shall be brought by the personal representative of the decedent: "The amount recovered in such action is not liable to be applied as assets in the payment of debts or legacies, but shall be disposed of as provided in this chapter for the distribution of personal property in case of intestacy." And Revisal, 60, provides: "The plaintiff in such action may recover such damages as are fair and just compensation for the pecuniary injury resulting from such death."

The Federal statute provides as follows: "Every common carrier by railroad, etc., shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee for such injury or death resulting in whole or in part from the negligence of any of the

officers, agents, or employees of such carrier, or by reason of any defect or insufficiency due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment."

Under our State statute the damages are based upon the present worth of the net pecuniary value of the life of the deceased. *Ward v. R. R.,* 161 N. C., 186. Under the United States statute the damages are based upon the pecuniary loss sustained by the beneficiary. *R. R. v. Zachary,* 232 U. S., 248.

Under the State statute the jury assesses the value of the life of the decedent *in solido,* which is disbursed under the statute of distributions. Under the United States statute, the jury must find as to each plaintiff what pecuniary benefit each plaintiff had reason to expect from the continued life of the deceased, and the recovery must be limited to compensation of those relatives in the proper class who are shown to have sustained such pecuniary loss. *R. R. v. Vreeland,* 227 U. S., 59; *R. R. v. Didricksen, ibid.,* 145; *R. R. v. McGinnis,* 228 U. S., 173; *R. R. v. Zachary,* 232 U. S., 248. In the latter case the Court said: "The statutory action of an administrator is not for the equal benefit of each of the surviving relatives for whose benefit the suit is brought. Though the judgment may be for a gross amount, the interest of each beneficiary must be measured by his or her individual pecuniary loss. That apportionment is for the jury to return. This of course excludes any recovery in behalf of such as show no pecuniary loss."

This was not overruled in *R. R. v. White,* 238 U. S., 507. In the latter case the defendant did not ask to have the damages apportioned by the jury, but moved for arrest of judgment after the verdict was rendered because the verdict was a general one. The Court merely held that the verdict was not void because not apportioned and that the apportionment was no concern to the defendant, who can not be heard if it did not except on the trial. None the less the plaintiff has a right, as in this case, to have the jury apportion the recoveries.

The defendant in this case strenuously insists that the matter has been settled otherwise in this State by the decision *In re Stone,* 173 N. C., 208. In that case the decision was correct upon the facts, for it was not an action brought under the Federal Employers' Liability Act, but a proceeding to distribute a fund in the hands of the administratrix, and this Court held that it should be distributed according to our statute of distributions, and the writ of error to the United States Supreme Court was dismissed for want of jurisdiction. The opinion in that case, quoting in conclusion from *R. R. v. White, supra,* said: "The amount allotted to each party entitled is no concern to the defendant, unless such allotment increased the amount of the total recovery." The *Stone case* was also correct in construing the Federal statute as to the three classes

of beneficiaries and holding as follows: "The Federal statute, therefore, creates three classes, which are separate and distinct from the other. If there is any member of the first class, but one or more of the second, then the third class will be excluded. If any member of the last class does not come under the provision 'dependent upon such employee' (*Dooley v. R. R.*, 163 N. C., 454), then such person is excluded from that class, and if such exclusion should apply to the whole of that class, then there can be no recovery. If the recovery by 'next of kin' should be enlarged by the wrongful inclusion of one not 'dependent,' that question must be raised at the trial by proper exceptions. *R. R. v. Zachary*, 232 U. S., 248."

The opinion *In re Stone*, however, proceeded to say, as contended by the defendant in this case, that "the Federal statute makes no provision for the apportionment of the funds, and therefore the State statute controls. The source of recovery is the United States statute, and that indicates only the different classes of the beneficiaries and the manner of ascertaining the amount due. But when the amount and class are ascertained, the sum paid or recovered must be distributed in that class according to the requirement of the State law." It is true this was not necessary to the decision in that case, but we must frankly say, after further advisement and fuller consideration, that this conclusion cannot be sustained. It is at variance with the tenor of the Federal statute, which is based upon the loss of each beneficiary in the class entitled as the measure of the recovery, and this can only be ascertained, logically, by a finding of the jury as to the amount of loss sustained by each of the beneficiaries entitled. It may well be that one or more of the children or one or more of the next of kin may have received very slight or no pecuniary loss, while the loss to others who were "dependent upon the deceased" was much greater.

In *Collins v. R. R.*, 148 N. Y. Supp., 781, the Court quotes from *R. R. v. McGinnis*, 228 U. S., 173, as follows: "The statutory action of an administrator is not for the equal benefit of each of the surviving relatives for whose benefit the suit is brought. Though the judgment may be for a gross amount, the interest of each beneficiary must be measured by his or her individual pecuniary loss. That apportionment is for the jury to return. This will, of course, exclude any recovery in behalf of such as show no pecuniary loss," and adds that the jury having returned a verdict *in solido* without apportioning the amount among those dependent upon the plaintiff's intestate, the judgment was reversed.

In *Kenney v. R. R.*, 167 N. C., 14, this Court held that the words "next of kin" must be construed in each State by the statutory meaning of those words in that State, and on writ of error, 240 U. S., 489, this was upheld; but this does not militate against the apportionment re-

HORTON *v.* R. R.

quired by the statute as to each member of the class entitled to recover.

This matter has been so fully considered by the United States Supreme Court that we do not deem it necessary to elaborate it, or to say more than that our contrary ruling in the *obiter dictum* in the *Stone case* is overruled.

Exception 10 is as to the following charge: "As to the children, the damages would be such an amount as the deceased would reasonably be expected, under all the facts and circumstances in the case, to have contributed towards the maintenance and education of the two children; the loss sustained is peculiarly their own, including a recovery for the loss of that care, counsel, training and education which the child might, under the evidence, have reasonably received from the parent, and which could only be supplied by the services of another for compensation."

And Exception 13 is that the Court charged: "The award for each child will embrace compensation for the loss of that care, counsel, training, and education which it might, under the evidence, have reasonably received from its father, and which can only be supplied by the services of another for compensation. The jury will note in this instruction that the element of damage with regard to the care, counsel, training, and education of the children is an element which applies to them but which does not apply to the wife."

We find no error in these instructions. The defendant objects that the jury were not restricted to the minority of the children as regard maintenance. But we think that it is a fair and reasonable intendment from the context and that the jury could not have been misled. The instruction was as to the loss of care, counsel, training, and education, to be reasonably expected from the father, and maintenance naturally would be implied only to the same extent.

Exceptions 14 and 15 are merely formal, and the other exceptions not discussed above were, as already stated, abandoned by not being brought forward in defendant's brief.

No error.

WALKER, J., dissenting: The court, by its charge to the jury, virtually eliminated the defense of assumption of risk by the following instructions to which an exception was duly taken: "If the jury find from the evidence that the wreck which caused the death of the plaintiff's intestate was solely and proximately caused by the negligence of defendant's servants in not properly applying brakes on cars standing on its main line, on a grade, the jury are instructed that the risk of this negligence was not assumed by the deceased in allowing the caboose in which he was riding to be pushed by the engine, even if the deceased would have escaped injury if the caboose had been behind the engine, instead of in

front of it." There are several reasons why this instruction is erroneous:

1. There is no evidence to sustain it, as all of the testimony showed that the wreck was caused by the collision of the loose cars and the train, and this was due far more to the fault of the intestate than to that of the defendant.

2. Assumption of risks as a defense is not excluded by the act of Congress unless there has been a violation of the statute enacted for the safety of employees, or, in other words, the Safety Appliance Acts, and which relate to automatic couplers, grab-irons, height of drawbars, train brakes, driving wheels, and ash pans, and defects in appliances of that kind, but there is nothing in the enumeration which includes the negligence of an employee in coupling cars. There is no evidence in this case that any of the appliances were defective or that there was any failure to comply with the provisions of statutes passed for the protection of employees, as all appliances were there and in good order and condition; and here, we may well refer to decisions of the highest Federal Court upon the question whether there is any such evidence. The law does not infer negligence from the mere occurrence of an accident, such as the parting of a train of cars, even if a coupling has come apart, provided it was of the required kind and in good condition. There is nothing here but the fact that the cars parted and that the coupling was opened, though in good order, but how opened does not appear. Let us see, then, how such a state of the evidence is regarded by that Court.

In *Balten v. R. R.,* 179 U. S., 658, the Court held that the fact of the accident—where plaintiff, a fireman, was injured by stepping off his engine at the end of a trip, and the step turned with him and threw him under the engine, where his leg was crushed by the wheels—was no evidence of negligence on the part of his employer. The Court, premising that the fireman should have waited for the inspection to be made before hazarding the use of the step, then said:

(*a*) That while in the case of a passenger the fact of an accident carries with it a presumption of negligence on the part of the carrier, a presumption which, in the absence of some explanation or proof to the contrary, is sufficient to sustain a verdict against him, for there is prima facie a breach of his contract to carry safely (*Stokes v. Saltonstall,* 13 Pet., 181; *R. R. v. Pollard,* 22 Wall., 341; 22 L. Ed., 877; *Gleeson v. R. R.,* 140 U. S., 435, 443), a different rule obtains as to an employee. The fact of accident carries with it no presumption of negligence on the part of the employer; and it is an affirmative fact for the injured employee to establish that the employer has been guilty of negligence. *R. R. v. Barrett,* 166 U. S., 617.

(*b*) That in the latter case it is not sufficient for the employee to show that the employer may have been guilty of negligence; the evidence must point to the fact that he was. And where the testimony leaves the matter uncertain and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion. If the employee is unable to adduce sufficient evidence to show negligence on the part of the employer, it is only one of the many cases in which the plaintiff fails in his testimony; and no mere sympathy for the unfortunate victim of an accident justifies any departure from settled rules of proof resting upon all plaintiffs.

And again: "The plaintiff was not then called upon to have anything to do with the engine until·after it had been inspected and repaired. He chose, for his own convenience, to go upon the engine and do his work prior to such inspection. No one can say from the testimony how it happened that the step became loose. Under those circumstances it would be trifling with the rights of parties for a jury to find that the plaintiff had proved that the injury was caused by the negligence of the employer."

*Looney v. R. R.,* 200 U. S., 480, is also pertinent to this question. The essential facts of the case and the point decided are well stated in the headnotes to the case as reported in 50 L. Ed., at p. 564, as follows:

"1. A street railway pitman, by unnecessarily touching the uninsulated parts in adjusting the leads connecting the motive power of a street car with the overhead current, relieves the company from liability for his death from the resulting shock, although the conductor of the car may have been negligent in permitting the trolley pole to come in contact with the trolley wire.

"2. The existence of defects in the insulation which would render a street railway company liable for the death of an employee occasioned by a shock received in adjusting the leads connecting the motive power of a car with the overhead current, cannot be inferred from the presumption of the exercise of due care on the part of a person killed, although, in the absence of a leak in the insulation, no shock could have been received unless he had unnecessarily touched the uninsulated ends of the leads."

In the course of the opinion in *Looney's case,* the Court said, by *Justice McKenna:* "Plaintiff must establish grounds of liability against the defendant. To hold a master responsible, a servant must show that the appliances and instrumentalities furnished were defective. A defect cannot be inferred from the mere fact of an injury. There must be

some substantial proof of the negligence. Knowledge of the defect or some omission of duty in regard to it must be shown."

*R. R. v. Barrett,* 166 U. S., 617, is cited by the Court, wherein it appeared that a fireman in charge of a switch engine was injured by the explosion of the boiler of another engine. There was evidence tending to prove that the boiler was and had been in a weak and unsafe state by reason of the condition of the stay bolts, and that if a well-known test had been applied the condition of the bolts would have been discovered. The Circuit Court instructed the jury that the mere fact of the injury received from the explosion would not entitle plaintiff to recover; that, besides the fact of the explosion, he must show that the explosion resulted from the failure of the railroad company to exercise ordinary care either in selecting the engine or in keeping it in reasonably safe repair. The court also instructed the jury that the burden of proof was on the plaintiff throughout the case to show that the boilers and engines that exploded were improper appliances to be used on its railroad by the defendant; that by reason of the particular defects pointed out and insisted on by the plaintiff the boiler exploded and injured him, and the plaintiff was ignorant of the defects and did not by his negligence contribute to his injury.

Passing on these instructions, the Court said, in the *Barrett case,* that they laid down the applicable rule with sufficient accuracy; and in substantial conformity with the views of the Court expressed in prior cases which were cited. It was further said that a presumption in the performance of duty attends the defendant and must be overcome by direct evidence.

In the *Patton case,* already cited, the Court, referring to this question, held that no inference of negligence can be based upon mere matter of conjecture, or the mere possibility that negligence existed. There must be something more than a guess or supposition that a defendant was negligent in order to charge him with liability. These cases are cited with approval in *R. R. v. Wiles,* 240 U. S., 444 (60 L. Ed., 732), where it appeared that a train of cars had parted at one of the couplings by the pulling out of the drawbar, which the Court said was not, by itself, proof of the company's negligence, and disapproved the ruling of the court below, it having applied the rule *res ipsa loquilur,* or the thing itself speaks. Wiles was required by the rules of the company to protect the rear of his train by going back and placing fuses or torpedoes on the track to warn the approaching train of the accident, so that a collision would be averted. He failed to do this and the approaching train crashed into the caboose, where he was at the time and killed him. The Court said of these facts:

HORTON *v.* R. R.

"His fate gives pause to blame, but we cannot help pointing out that the tragedy of the collision might have been appalling. He brought death to himself and to the conductor of his train. His neglect might have extended the catastrophe to the destruction of passengers in the colliding train. How imperative his duty was is manifest. To excuse its neglect in any way would cast immeasurable liability upon the railroads and, what is of greater concern, remove security from the lives of those who travel upon them; and therefore all who are concerned with their operation, however high ·or low in function, should have a full and an anxious sense of responsibility. In the present case, there was nothing to extenuate Wiles' negligence; that was nothing to confuse his judgment or cause hesitation. His duty was as clear as its performance was easy." The Court further said that he knew the dangers of the situation, and it was his duty to avert them by obeying the rules · of the company, adopted for his own protection as well as that of the traveling public. In our case, the facts are revealed to us. The train was properly equipped with brakes and couplings of the required type, and after the cars had been coupled together, they stood for some time before the coupling was opened, in some way not known, and the cars parted. There is no more reason in this case for the application of the rule *res ipsa loquitur* than in the cases we have cited, and not as much as in those cases; and, if we look on the other side of the question, it appears that the intestate brought the catastrophe upon himself by his own willful and reckless act. He knew the rules of the company, and he knew the law as to headlights, and he insistently took the course that resulted in this dreadful disaster against the earnest protest of his engineer, who warned him of the danger, and obscuring the view of the latter by the car which cut off entirely all light and all chance of safety, he blindly proceeded with his train towards Monroe from Wingate, and thus rode to his death. We may pause to blame him in the presence of the great calamity, but our present duty is to declare the law and to preserve the rights of the defendant when it has been guilty of no legal wrong. We cannot conceive of more reckless conduct. He hazarded every chance and assumed every risk. He violated the law of this State, and, under it, he was criminally negligent. If he had placed the caboose at the rear end of his train, there would have been "a wreck," as the instruction puts it, but his life would have been saved as the facts show. So that his death was caused by his own act while he was violating the company's rules and the general law. There is no act of negligence which has been more severely condemned by this Court, and properly so, than the movement of a train without a headlight. *McNeill v. R. R.,* 167 N. C., 390, and other cases *infra.*

What should be said of this act of negligence when a car is so placed ahead of the engine as not only to cut off the engineer's view to the front of his train but to blindfold him entirely and remove any possible chance of safety. If the caboose had been in its proper place the accident would not have occurred, for the engineer had 1,700 feet of clear and straight track in front of him, and east of the place where the collision occurred the track was straight for 300 yards or 900 feet, and besides, he had a headlight of 1,500 candlepower, measured without the aid of a reflector. With all these aids he could have seen far ahead and reversed the motion of his train or backed to a higher level, and thus got beyond the reach of the runaway cars; but of all these advantages the engineer was deprived by the intestate's own conduct, which was taken against his will and his strong protest.

Let us see what condemnation has been passed upon such a case in our own reports. In *McNeill v. R. R., supra,* it is said by the *Chief Justice* that the failure to have a headlight is not only criminal but is negligence of such a character as to be "the *causa causans* of the death," where death ensues. And further, at pp. 398, 399, 400, and 404: "In the present case there is a statute requiring electric headlights, and if the plaintiff's intestate was stricken and killed by an engine running without any headlights, it was negligence *per se* under those authorities. The defendant was running in violation of law and was committing an indictable offense. If a man while committing an indictable offense kills another, it is at least manslaughter. For a stronger reason he is liable for negligence. . . . Even before the statute of 1909, ch. 466, it was held that it was negligence *per se* to carry no headlight. *Willis v. R. R.,* 122 N. C., 909. There is a long line of decisions which hold that it is negligence to operate a train without a headlight. *Stanly v. R. R.,* 120 N. C., 514; *Heaverner v. R. R.,* 141 N. C., 245; *Brown, J.,* in *Allen v. R. R., ibid.,* 340; *Walker, J.,* in *Morrow v. R. R.,* 147 N. C., 627; *Brown, J.,* in *Hammett v. R. R.,* 157 N. C., 322; *Shepherd v. R. R.,* 163 N. C., 518.

"As there was evidence sufficient to go to the jury that the deceased was killed by the train when it was operating without a headlight, such negligence was the proximate negligence. . . . If the jury found from the evidence that the defendant company operated its engine without a headlight, and that the deceased came to his death as the result of being struck by such engine, this was negligence *per se* or negligence of itself, on the part of the railroad company, and you should answer the first issue 'Yes.' . . . If this light was not furnished, the company was not only negligent, but its negligence was a continuing one. . . . It is well established that the employees of a railroad company are required to keep a careful and continuous lookout along the track;

and the company is responsible for injuries resulting as the proximate consequence of their negligence in the performance of its duty. How could this duty be performed in the night-time in the absence of a headlight? . . . A more deadly instrument of death and destruction cannot be devised than one of these powerful engines rushing across the country on a dark night at 20 to 70 miles an hour without giving warning by headlight. *Shepherd v. R. R., supra; Horne v. R. R.,* 170 N. C., 645."

This is all just condemnation, and the statutory denunciation is in full accord with it. When an employee brings disaster to himself by an open and deliberate violation of the law and the rules of his employer, we may regret the unfortunate result, but we cannot close our eyes to his legal wrong, and to the plain injustice of saddling someone else with damages, when the latter had adopted the rules for the protection of the wrongdoer, and to prevent the occurrence of just such a disaster. The employer company knew, as everybody knows, that if there is no headlight on the engine, or the outlook of the engineer is completely obstructed by a caboose car, which is worse than no light, the train and its passengers are constantly exposed to fearful accidents, and, when the caboose is in the lead, without any possible chance of escape for the passengers, the train then becomes a deathtrap. Can it be said that the employee who by his own act and order brings about such a dangerous situation does not assume all risks? If in the presence of a risk created by the master, of which he knows and the danger of which he realizes, he is said to assume the risk, why does he not assume it when he creates the risk himself, the extreme danger of which is a constant one?

We said in *Whitson v. Wrenn,* 134 N. C., 86: "It is the duty of the servant, it is true, to obey the orders given him, unless obedience to them will be obviously dangerous; in which case he has the right and it is his duty to himself to disobey them. The law requires that he should do so or suffer the consequences of his recklessness. Our case is the very converse of the one stated. Here the servant was ordered to do his work in a safe way, and he preferred to do it in another and what proved to be a dangerous way. Why should the master be liable if the servant acted in disobedience to his orders and was thereby hurt? It must be admitted that he was the author of his own injury. If it was necessary that the method adopted by him should have been not only in disobedience of his orders, but in itself dangerous, in order to visit upon him the consequences of his refusal to observe his master's directions, it surely is not required that it should have been obviously dangerous. It is quite sufficient to bar his recovery if he knew that his method was a dangerous one, and chose to do his work in that way rather than in the manner pointed out by his master." That case has often been cited with approval.

C. The instruction of the court quoted above is faulty in another particular. It takes away from the defendant the defense of assumption of risks, if the defendant's servants by their negligence caused the intestate's death. The act of Congress contains no such provision, and this case was tried under it. The company could not possibly foresee that such negligence would take place and provide against it. There is no reference to such negligence in the act of Congress, as being one of those things which is the subject of the legislation. It is not mentioned by name in the safety appliance act, and an employer could not well anticipate it, even if there is any evidence of such an act of negligence in this case. The jury could do no more than guess that it was the cause of the death, and this is not sufficient evidence, as we have shown.

D. If there was any evidence of negligence on the part of the defendant which caused the wreck, it was not proper to instruct the jury, as the court did, that the wreck was the proximate cause of the death, as the jury might have found from the evidence that, while the wreck resulted from defendant's negligence, it was not the proximate cause of the death, as the conductor would not have been killed if he had not been grossly negligent in placing the caboose in front of the engine, and all the evidence tended to prove that he would not have been killed had he obeyed his orders, and placed the caboose at the other end of his train; and there also was evidence that if the engineer's view and the headlight had not been obstructed, he might have escaped injury. What was the proximate cause of the death was not a question which the court could decide in favor of the plaintiff as matter of law. It would have been more nearly right to have given such a charge in favor of the defendant. The instruction was "that the wreck caused the death of plaintiff's intestate." It is true that he died in the wreck, but whether this would have occurred but for his own act was a question for the jury and this error had a direct effect upon the first issue, as to whether the death was caused proximately by the defendant's negligence, as well as upon the issue as to assumption of risk. We do not think the court was justified in telling the jury that the wreck, in law, proximately caused the death, as whether it did or not involves the question as to the intestate's own negligence and the part it played in this tragedy. In this discussion we have assumed, of course, but only for the sake of argument, that there is tangible and legal evidence of the defendant's negligence.

It must be that a railroad company would be grossly derelict in its duty, both to the public and its employees, if it failed to adopt such rules and regulations for the running and operating of its trains as make for safety, and it follows that the servant, for whose guidance in the discharge of his important and hazardous duties these rules are made, must

obey them, and if he fails to do so and is himself injured by reason of his disobedience, he is to be regarded in law as the author of his own injury, and if thereby he injures others, the railroad company is liable to them under the rule *respondeat superior,* and he is liable to the company for all damages caused by his negligence. *Holland v. R. R.,* 143 N. C., 435; *Haynes v. R. R., ibid.,* 154.

We said in *Holland v. R. R., supra*: "The intestate was the one to whose keeping had been committed the safety of his comrades in the company's service, of the passengers on the train, and of his employer's property, and he was more responsible for it than any one else. He failed in the performance of his duty at the very moment when his obedience to orders and his vigilance were most required to prevent the resulting catastrophe. His negligence was ever present and the efficient, and, indeed, the dominant cause of his injury and death, reaching to the effect and therefore proximate to it. To subject the defendant to a recovery in such a case does not seem to be equitable, and would certainly contravene established principles of law. Plaintiff's death was caused, not by the defendant's negligence, but by his own disobedience of instructions. If a servant disregards the express directions of his master, and pursues his own way in performing his duties, the resultant injury to himself, if any, the law imputes to his own willful or negligent act, as the proximate cause, if not the only cause thereof. The intestate simply did something which he was told not to do. He substituted his own will for that of his employer, and his case falls within the maxim *Volenti non fit injuria."* *Whitson v. Wrenn,* 134 N. C., 86; *Hicks v. Mfg. Co.,* 138 N. C., 319; *Stewart v. Carpet Co.,* 138 N. C., 60; *Biles v. R. R.,* 139 N. C., 532; *Patterson v. Lumber Co.,* 145 N. C., 42.

What we said in the first appeal in the same case is quite as much, if not more to the point, as will be seen from this extract: "All things considered, the question at last is, Was the situation a safe one, if the intestate had kept the position assigned to him by the defendant at or near the switch, so that he could prevent any interference with it and guard against any resulting danger? If so, his failure so to act was the proximate cause of his death, as it was the sole efficient cause. The company had provided a perfectly safe method of management of its train at that point, which if adopted would have saved the life of the intestate." *Holland v. R. R.,* 137 N. C., 373; *Holland v. R. R., supra.* We are referred by defendant's counsel to the case of *R. R. v. Chapman,* 62 S. E. (Ga.), 488, as supporting the position that intestate having violated the company's rules promulgated for his safety, and also the statute, he occupied, as between himself and defendant no better position than a stranger, and was entitled to no greater degree of care from the company, and the case seems to be relevant to the point and sustains

it. See, also, *Lloyd v. R. R.,* 151 N. C., 536, also cited in defendant's brief in the same connection. Rule 17 of the defendant requires that "the headlight be displayed to the front of every train at night." This rule is disobeyed, even if the light is burning, provided a car is put in front of it so that the engineer cannot see ahead of his train, and though a man should be placed on the leading car—here a tank car—as a look-out. The statute and rule requires a certain kind of light, sufficient in candlepower and so placed as to enable the engineer to see far ahead on the track and avoid collisions with objects on the tracks by stopping his train or reversing it, as the situation may require, and in this case such provision by the conductor would have saved his life and would have suggested itself to any man of ordinary prudence without a statute or a rule to guide him.

It all comes to this, that, if the verdict and judgment are to stand, the defendant will be made to pay heavy damages to the plaintiff for the death of her intestate, whose own act was directly responsible for it, and who committed that act in plain disregard of defendant's rules, adopted for the very purpose of protecting him and preventing it, not to say anything of the damage done to the defendant's property, and that, too, when the intestate's act was intentional, while that of the defendant was not so. The conductor disobeyed the law, and the positive orders of the defendant, as we have said, and the latter should not be required to bear any loss or pay any damages by reason of it. It has already lost property without recompense, or the probability of any.

E. Upon the question of damages, it may be said that the act of Congress does not contemplate a separate assessment of damages for each beneficiary, but one that is *in solido,* or for all the beneficiaries. *R. R. v. White,* 238 U. S., 507; *In re Stone,* 173 N. C., 208; *Kenney v. R. R.,* 167 N. C., 14. In the *Stone case* the *Chief Justice* said: "The Federal statute makes no provision for the apportionment of the fund, and therefore the State statute controls. The source of the recovery is the United States statute, and that indicates only the different classes of the beneficiaries, and the manner of ascertaining the amount due. But when the amount and class are ascertained, the sum paid or recovered must be distributed in that class, according to the requirement of the State law. In this case there being a widow and a child, the amount is to be divided between them, according to our statute, two-thirds to the child and one-third to the widow. That matter is regulated by the State statute of distribution," citing *Cent. Vt. R. Co. v. White, supra.*

It is said that in *Stone's case* the Court was dealing wtih a fund already recovered without apportionment, but, as I understand it, that was not the ground of the decision, which was the plain meaning of the

act of Congress as declared by the highest Federal Court in *R. R. v. White, supra.*

Referring to the statutes of those states which do not provide for an apportionment of the damages to the several beneficiaries, it is said by the Court in the *White case*: "The Employers' Liability Act is substantially like *Lord Campbell's* Act, except that it omits the requirement that the jury should apportion the damages. That omission clearly indicates an intention on the part of Congress to change what was the English practice so as to make the Federal statute conform to what was the rule in most of the states in which it was to operate. Those statutes when silent on the subject, have generally been construed not to require juries to make an apportionment. Indeed, to make them do so would, in many cases, double the issues; for, in connection with the determination of negligence and damages, it would be necessary also to enter upon an investigation of the domestic affairs of the deceased—a matter for probate courts and not for jurors."

This language would seem to condemn the form of the verdict in this case. The plaintiff in error, defendant below, insisted that the verdict should have apportioned the damages as here, instead of allowing a gross sum, as the jury did in that case. But the Court rejected this view and held that the verdict should be *in solido*.

It may not concern the defendant how the distribution of the fund is made by the law, but the verdict, as it now stands, presents an anomaly, when we consider how the money will be divided among the parties. Under our statute, the widow will get one-third, and the two children one-third each (Revisal of 1905, ch. 1, sec. 131), for "where there is a widow and not more than two children," that is the portion allotted to each of them. It follows that the widow will not get $10,000, which the jury gave to her, but only one-third of $20,000, which is the whole amount of the damages, or about $6,666,66, whereas the two children will each receive the same amount. That is, the widow will get about $3,333.33 less than the amount allotted to her, and the children will get that much more than the jury gave them, though this extra amount will not be received because of any dependency upon their father and the loss of his care and support, notwithstanding the act of Congress requires that the recovery by them should be based on such loss. The defendant may be interested to know that money is being collected from it, which will actually be paid to some of the parties who are not entitled to it under the terms of the act, though in form it was given to another by the verdict.

It is also objected by defendant that the charge of the court as to the children was too broad, that is, covered too much time, and that as to maintenance and education it should have been restricted to their mi-

nority. This would seem to be a·just and proper criticism. There are other assignments of error, but we will not undertake to review them, as the discussion of the case has already been prolonged far beyond what we originally intended is due to the great importance of questions involved.

The Court has held that the judgment should be affirmed, while we think that it should be reversed, and a new trial awarded, as in opinion, serious error was committed at the trial.