MRS. B. M. MOORE, ADMINISTRATRIX OF B. M. MOORE v. DIRECTOR GENERAL OF RAILROADS, ET AL.

(Filed 2 June, 1920.)

1. **Issues—Negligence—Employer and Employee—Master and Servant— Federal Employer's Liability Act—Statutes—Separate Issues—Legal Dependents.**

    In an action to recover damages for the negligent killing of the deceased by a railroad company while engaged in interstate commerce under the provisions of the Federal Employer's Liability Act, an objection is untenable that the damages should have been assessed *in solido* upon a single issue, nor is it reversible error to have submitted separate issues on that question, as to each of the legal dependents of the deceased, applying to each the approved interpretation of the Federal Statute, that the pecuniary loss suffered or to be reasonably expected by such dependent is a measure of liability. *Horton v. R. R.*, 175 N. C., 472, and *Hudson v. R. R.*, 176 N. C., 488, cited and applied.

2. **Evidence— Nonsuit— Federal Employer's Liability Act— Motions— Statutes—Employer and Employee—Master and Servant.**

    Under the Federal decisions and those of our State Court, the rule of procedure on a motion to nonsuit upon the evidence, equivalent with us to a demurrer thereon, the facts presented which make in favor of plaintiff's claim must be accepted as true, and interpreted in the light most favorable to him.

    Evidence examined and held sufficient to carry the case to the jury on the issue of defendant's liability.

CIVIL ACTION, Under the Federal Employer's Liability Act, to recover damages for alleged negligent killing of plaintiff's intestate, tried

before *Bryson, J.,* and a jury, at at January Term, 1920, of HAYWOOD.

Plaintiff alleged and claimed that on 28 July, 1918, her intestate, an employee of the railroad company, under charge and control of defendant, was negligently run over and killed by the kicking or shunting of cars on to the track on or near which the intestate was standing at the time.

There was denial of liability by defendant, plea of contributory negligence and assumption of risk, etc. The proof showed that the intestate left him, surviving, his widow, the present plaintiff, and two infant children, a girl, Vernell Moore, three to four years of age, and a boy, Maurice or Morris Moore, aged one month or over, dependent on intestate within the meaning of the statute, and on this and further evidence offered, the jury rendered the following verdict:

"1. Was the plaintiff's intestate killed by the negligence of the defendant, as alleged in the complaint? Answer: 'Yes.'

"2. Did the plaintiff's intestate, by his own negligence, contribute to his death, as alleged in the answer? Answer: 'Yes.'

"3. Did the plaintiff's intestate assume the risk of being killed in the way and manner he was killed? Answer: 'No.'

"4. What damage, if any, is plaintiff entitled to recover for herself, as the widow of her intestate? Answer: '$1,000.'

"5. What damage, if any, is plaintiff entitled to recover for the infant, Vernell Moore? Answer: '$2,000.'

"6. What damage, if any, is plaintiff entitled to recover for the infant, Morris Moore? Answer: '$2,000.'

Judgment for the aggregate amount on this verdict for plaintiff, and defendant excepted and appealed, assigning errors.

*T. A. Clark and Felix E. Alley for plaintiff.*
*Martin, Rollins & Wright for defendant Director General, etc.*

HOKE, J. On the argument before us, defendant's counsel rested their right to a new trial upon the two objections, first that the question of damages was submitted on separate issues as to each of the dependents, second that on the entire testimony defendant's motion for nonsuit should have been allowed.

In reference to the first position, it has been recently held with us in two or more cases where the question was directly considered that under the Employer's Liability Act and the authoritative Federal decisions construing the same, the award of damages might be properly assessed upon separate issues. *Hudson v. R. R.,* 176 N. C., 488; *Horton v. R. R.,* 175 N. C., 472-477.

In *Horton v. R. R.,* the Court, in approving a verdict similar in form to that rendered in the instant case, said: "Under the State statute the jury assesses the value of the life of the decedent *in solido,* which is disbursed under the statute of distributions. Under the United States statute, the jury must find as to each plaintiff what pecuniary benefit each plaintiff had reason to expect from the continued life of the deceased, and the recovery must be limited to compensation of those relatives in the proper class who are shown to have sustained some pecuniary loss. *R. R. v. Vreeland,* 227 U. S., 173; *R. R. v. Zachary,* 232 U. S., 248. In the latter case the Court said: 'The statutory action of an administrator is not for the equal benefit of each of the surviving relatives for whose benefit the suit is brought. Though the judgment may be for a gross amount, the interest of each beneficiary must be measured by his or her individual pecuniary loss. That apportionment is for the jury to return. This of course excludes any recovery in behalf of such as show no pecuniary loss.'

"This was not overruled in *R. R. v. White,* 238 U. S., 207. In the latter case the defendant did not ask to have the damages apportioned by the jury, but moved for arrest of judgment after the verdict was rendered because the verdict was a general one. The Court merely held that the verdict was not void because not apportioned and that the apportionment was no concern to the defendant, who can not be heard if it did not except on the trial. None the less the plaintiff has a right, as in this case, to have the jury apportion the recoveries."

Under the Federal decisions referred to in this excerpt, even if the question of damages had been submitted on a single issue as defendant desired, the estimate of the amount would have been determined according to the rule or principle expressed in these separate issues, and to our minds the exception presents no substantial objection to the validity of the trial.

As to the second objection, it is the rule prevailing in both State and Federal procedure that on a motion for involuntary nonsuit, equivalent with us to a demurrer to the evidence the facts presented which make in favor of plaintiff's claim, must be accepted as true and interpreted in the light most favorable to him. *Lamb v. R. R.,* at the present term, p. 619, citing, among other authorities, *Aman v. Lumber Co.,* 160 N. C., 369; *Biles v. R. R.,* 143 N. C., 78; *Chinoweth v. Haskell,* 3 Peters, 92; *Pawling v. U. S.,* 4 Cranch, 219.

Considering the record in view of this principle, there were facts in evidence on the part of plaintiff tending to show that intestate at the time of his death was the member of a switching crew engaged at the time in shifting cars on the railroad yards at Canton, N. C., under the control and direction of the yardmaster, Jesse Harrison. That at this

station there was the main railroad track running east and west and just south of this and parallel was a siding known as the house track for the use and occupation of cars hauling general freight.

North of the main track were a number of sidings, principally for cars hauling freight, etc., for the Champion Fibre Company, arranged and numbered as follows:

Some distance west of the station there was a lead track, switched off from the main track and running clear through the company yard, for the greater part some distance from the main track, but substantially paralleled to it, and from this lead track several sidings ran out into the yard between the lead and main tracks, numbered from the main track 1, 2, 3, 4—No. 4 being the one nearest the lead track.

That at the time of the occurrence the switching engine ran from the lead track onto track No. 4, and was connected with a train of 8 or 9 cars thereon, and on signal given, drew these cars out onto the main lead track, the train so constituted being long enough to extend past the switch of this lead track and in part onto the main line; on further signal given, the train was started back and the four rear cars having been detached on attaining sufficient speed, the engine slowed down, leaving these four rear cars of their own momentum to pass down onto the main lead track, at or near which the intestate was then standing, and was by them run over and injured so that he soon thereafter died.

The evidence showed that the four or five forward cars of the train were to be switched over to the house track, but that the rear cars holding coal for the Champion Fibre Company were thus kicked or shoved down on the main lead track to be run to the coal chute of the fibre company further down on the yard.

There was no bell rung nor signal given when this train was started back after being pulled out of track 4 and no one was on the cars at the time to control them or to signal to any one who might have been on the main lead track.

The yardmaster at the precise time of the killing was not immediately present, but had gone a hundred feet or more over toward the house track to run a child off from that track, where four of these cars were to be presently placed, and intestate at the time standing on or near the main lead track was looking at the yard master engaged as stated.

There was no proof offered that the yardmaster had informed the crew, or any of them, where these four coal cars were to be placed, except by marking them with chalk on the side 2 x 2, or Champion Fibre Company, the testimony leaving it uncertain whether the intestate knew of this marking or what it signified.

There were facts in evidence also tending to show that at the time of

the occurrence, or immediately thereafter, some of the crew, including the yardmaster, asked the intestate while he was still conscious how it happened and he replied that he did not expect them to back on the main lead track, or that the train had backed on the wrong track. It was further shown, or there was evidence tending to show, that it was the custom to leave the fibre company cars on track No. 4 till they were to be run into the company yards to deliver their contents, and if these cars had been backed onto track No. 4 they would not have struck the intestate, and further, that while this yard on the north of the main track was used chiefly for the company's business, it was not in fact a closed yard, but there were tracks or trails along or across the same, near to the place of the killing not infrequently used by employees and others, and plaintiff also put in evidence three rules of the company. Rule 783, defining the duties of the yardmaster in terms as follows:

"They have charge of their respective yards, and of the making up and distribution of trains, and the handling of cars therein, and of all yard employees and engine men and train men while in the yard limits." And Rule 393: "They must not allow running or flying to be made when it can be avoided, and when unavoidable, such movements must be made with all the care necessary to absolutely prevent accident." Also Rule No. 30, to the effect that "the engine bell must be rung when an engine is about to move."

It was further testified that afterwards, the yardmaster, speaking of the occurrence, had said that he felt he was the cause of intestate's death. "That Moore was standing at his post ready to grab the coach, or car, as it came by, and something went wrong; that they either kicked or shoved the cars in there, and they ran over him and knocked him off; that something went wrong; he did not say what it was," etc.

There is much evidence in the record tending to exculpate defendant, and to show that the death of the intestate was due to his own neglect, but this comes from defendant's testimony, or from an interpretation of the facts favoring this position, and applying the accepted rule that on a motion for involuntary nonsuit it is only the facts and inferences supporting plaintiff's claim may be properly considered, we think it clearly the permissible and reasonable conclusion that defendant's agents and employees on this occasion, and for whose conduct defendant is responsible, were not sufficiently careful of defendant's safety, and that their breach of duty was the proximate cause of intestate's death.

While this was a shifting yard of the company, there were facts in evidence tending to show that it was by no means a closed yard, but there were trails or paths along or down the tracks at or near the place.

In such case, with or without a rule, it is always considered highly dangerous to kick or shift cars onto a track detached from an engine,

41—179

and without any one in position to control their movements or warn persons who may be upon the track, employees or others.

There were also facts in evidence tending to show a custom that the fibre company's cars· were always left on track No. 4 till they were needed by the company, and that there was no sufficient notice given that in this instance the custom would be departed from or that the cars were then required and were to be backed upon the main lead track where the intestate was standing. Four of these cars were to be backed on the house track, and Harrison, the yardmaster, was over there at the time driving a child off the house track, lending color to the inference that the train was to be presently backed on to the house track—a conclusion that finds much support in the declarations of the intestate made to several persons immediately after he was "struck," that he was not expecting the cars to come·back on the lead track where he was standing, or "they had come back on the wrong track"; and further, in the declaration of the yardmaster "that something had gone wrong."

We are cited by counsel to the case of *Aerkfetz v. Humphreys,* 145 U. S., 418, as a decisive authority in support of defendant's motion. That case could very well be upheld on the ground of contributory negligence of the plaintiff, a position that was much relied upon throughout the opinion, and which is not now a complete defense, nor one available on a motion to nonsuit. *Grand Trunk Ry. v. Lindsay,* 233 U. S., 42-47. It was shown, too, that the cars were attached to the engine, and were being moved at the right time, in the right place, and at a proper rate of speed, the single imputation of negligence being that no bell was rung or signal given at the time; no rule seems to have been shown, as in this case, permitting the construction that such a signal was required, nor was there any evidence of negligence *ultra* which might have misled the claimant to his hurt. And in *Hinson v. R. R.,* 172 N. C., 646, also referred to by counsel, plaintiff was injured while attempting to cross rails under the drawheads of cars, standing on a live track, with nothing to show that the engineer or others operating the train knew, or had any reason or opportunity to know, of plaintiff's position or danger, and to our minds neither of these decisions seems to us an apposite authority on the facts of this record. The case, we think, comes rather under *S. Ry. v. Smith,* 205 Fed., 360, and cases of that kind, which require that on evidence similar to that now presented the issue of negligence should be submitted to the jury.

There is no error, and the judgment on the verdict is affirmed.

No error.

WALKER, J., dissenting: This action was brought under the Federal Employer's Liability Act, and is, therefore, to be decided under the

Federal law. *Meadows v. Tel. Co.,* 173 N. C., 240, citing *Fleming v. R. R.,* 160 N. C., 196; *Lloyd v. R. R.,* 166 N. C., 24; *Tilghman v. R. R.,* 167 N. C., 163 (*same case* on writ of error); *S. A. L. Railway Co. v. Tilghman,* 237 U. S., 499; *Railway Co. v. Renn,* 241 Y. S., 290. This being so, the decision of the case is governed by *Aerkfetz v. Humphries,* 145 U. S., 418, as the facts of the two cases are not materially different but substantially the same. If there is any essential difference, it is in favor of the defendant. The plaintiff's intestate was employed by the defendant as a switchman, and was an expert in his business. He was ordered to handle the very cars by which he was killed, and was standing in, or close to the track upon which the cars were moving. It was broad daylight, and the moving cars were plainly visible to him, there being nothing to obstruct his view of them, and right here occurred the negligence, all his own, which caused him to lose his life. He was standing on or near the track, not engaged in the actual performance of his work, but looking at the conductor removing a child from the main line about forty yards east of the place where he was killed. If he had been attending to his duties and looking in the right direction, this case would not be here.

The Federal Supreme Court, and this Court as well, has held repeatedly that a railroad track is itself a place of danger, and a sufficient warning to any one on it that prudence requires of him to take care of himself by using proper precaution for his own safety, as by looking and listening for approaching trains. The exact language was: "The track, as it seems necessary to iterate and reiterate, is itself a warning. It is a place of danger. It can never be assumed that cars are not approaching on a track, and that there can be no danger from them." The decisions in other States are clearly against the principle that circumstances like those we have here take the case out of the general rule, and it is held that no custom of the railroad company to run its trains according to a certain schedule, or to use one track and not another, or to run its trains at certain times in one direction (east), and at other times in another (west), will excuse one using its tracks from looking and listening, or requires the engineer to presume that he has not done so, but, on the contrary, it is held that he is within the zone of danger, however and wherever the track is located. *R. R. v. Hart,* 87 Ill., 529; *Morgan v. R. R.,* 116 C. C. A. (196 Fed., 449); *Kinnare v. R. R.,* 57 Ill., 153; *White v. R. R.,* 73 N. Y. Suppl., 827; *Smith v. R. R.,* 141 Ind., 92; *Boyd v. R. R.,* 50 Wash., 619. Many other cases might be cited, some of them being in defendant's brief.

The Court said, in *Morgan v. R. R., supra:* "It is altogether probable that he acted on the daughter's statement that the train did not come down that track; but he had no right to do so. Which of the

tracks would or should be used for its various trains was, of course, a matter for the exclusive determination of the railroad company." It was held in *Rich v. R. R.,* 31 Ind. App., 10, that a traveler using a railroad track has no right to confine his precautions to his knowledge of the schedules and customs of the company, but must take due care against the approach of "extra trains," and even "wild trains," those which are expected as well as those not expected to use the track on which he is walking. And in *White v. R. R., supra,* the Court stated that the accident was due entirely to the plaintiff's want of proper care for his own safety in relying upon his expectation, which was according to the railroad company's usage, "that the train by which he was struck would not come upon the track. He must look out for all trains, and any other rule, it was said, would measure his conduct by the altogether too liberal rule of chances and risks, and would impose upon the railroad company too rigorous and burdensome responsibilities," regardless of the inconvenience to the public arising from operating its trains under any such handicap. See, also, *High v. R. R.,* 112 N. C., 385; *Ward v. R. R.,* 167 N. C., 148, especially at p. 151 and at p. 152.

The same high Court, to which we have referred above, has said in somewhat different language from that quoted above: "The track itself, as it seems necessary to repeat with emphasis, is itself a warning. It is a place of danger, and a signal to all on it to look out for trains. It can never be assumed that trains are not coming on a track, and that there can be no risk to persons on the track from them." See 164 N. C., at margin p. 95, where the same principle is approved, and the cases decided in this Court to the same effect are collected. Turning again to *Aerkfetz v. Humphries, supra,* the Court said in that case, the facts of which are practically identical with those now before us: "There could have been no thought or expectation on the part of the engineer, or of any other employee, that he (the employee), thus at work in a place of danger, would pay no attention to his own safety. Under such circumstances, what negligence can be attributed to the parties in control of the train or the management of the yard? They could not have moved the cars at any slower rate of speed. They were not bound to assume that any employee, familiar with the manner of doing business, would be wholly indifferent to the going and coming of the cars. There were no strangers whose presence was to be guarded against. The *ringing of the bell and the sounding of whistles* on trains going and coming, and switch engines moving forwards and backwards, would have simply tended to confusion. The person in direct charge had a right to act on the belief that the various employees in the yard, familiar with the continuously recurring movement of the cars, would take reasonable precaution against their approach." And again: "Any ordinary at-

tention on the part of the plaintiff to that which he knew was a part of the constant business of the yard would have made him aware of the approach of the cars, and enabled him to step one side as they moved along the track. It cannot be that under these circumstances the defendants were compelled to send some man in front of the cars for the mere sake of giving notice to employees, who had all the time knowledge of what was to be expected. We see in the facts as disclosed no negligence on the part of the defendants, and if by any means negligence could be imputed, surely the plaintiff, by his negligent inattention, contributed directly to the injury. The judgment was right, and is affirmed." It must not be overlooked, or disregarded if seen, that in the *Aerkfetz case,* the Court held that the company was not guilty of any negligence, and that the death was caused *solely* by the plaintiff's own negligence, though it added, that if this were not true, the plaintiff was guilty of such contributory negligence as would bar his recover (and under present law affect only the measure of damages). If a person will not look when he can easily see that cars are coming which will injure him if he does not avoid them by stepping out of the way, but blindly and recklessly continues in a place of danger, he has no one but himself to blame for the resulting injury. The risk of such conduct is as plainly assumed as any risk could be. The intestate at the time of the accident was in full possession of his faculties, and could, with one motion, have placed himself beyond any possible danger. Having failed in his duty to himself, he will not be heard to charge defendant with consequences following solely from his own wrong.

The case of *Hinson v. R. R.,* 172 N. C., 646-648, would seem to be decisive of this one. It cites and quotes from *Aerkfetz v. Humphries, supra,* and adopts what is said therein, and then holds that, as the case should be considered, and decided, under the Federal law, the injury was caused by the plaintiff's own fault, and it alone, and that he was not entitled to recover. See, also, *Smith v. R. R.,* 130 N. C., 344.

It may clarify the matter if we quote from the testimony, which shows that the deceased was alone to blame, of plaintiff's witnesses, except where otherwise indicated: "I did not see the railroad man do anything only he motioned for him to come back and he started the engine; the man I saw motion was right down below me about 15 or 20 feet; he motioned to the engineer; I do not know who the man was who did the motioning; when he saw the motion the engineer started the train backwards down the track, and he got to going pretty fast and cut three coal cars loose, and they went on down there and knocked him (Mr. Moore) down. . . . Mr. Moore was facing towards his house when the cars were cut loose; he was standing sidewise; I did not see any other man around there just before the cars struck him. . . . I do

not know how long he continued to stand two feet from the track; the engine moved these cars back down this main lead; as they moved them back he was standing on the track as they came back; he was on the track; was over from the rail; on the inside of the rail before the cars hit him; he never moved out of the way at all when the cars were coming down, not until after the cars hit him and the cars pushed him down. . . . I saw the man giving the engineer the signal to come back; when he gave the signal he came back with his train; the engineer was on the right-hand side; that was the side Mr. Moore got run over on; I do not know where the man was standing that gave the signal for him (the engineer) to come back; he was above me a good piece. He was 150 feet, I guess, from where Mr. Moore was; Mr. Moore could have seen him give the signal. . . . At the time they lifted him up Mr. Harrison asked him how he came to get under there, and he said he was watching him get that little negro boy off the track, and that he did not know that the cars were coming in on the track or either they come in on the wrong track." The yardmaster, defendant's witness, testified: "I think they got that wrong about my having a conversation in the presence of Mr. Down with Mr. Moore in reference to how he got killed. H. B. Harrison is my brother. The only thing Moore said to me (he called me Harry), he says, 'Harry, this is awful.' I left him at once to go to the first-aid room of the Champion Fibre Company to get a stretcher, and I left him with H. B. Harrison." H. B. Harrison, defendant's witness, testified: "I asked him how it happened, and he said he was watching Harry—that is the yardmaster—and a little negro, and was not paying any attention to what he was doing, and the cars hit him. That is all I believe he said to me at that time."

It appears from this recital that the deceased was not looking out for moving engines or cars, but in quite another direction, and this was the efficient and proximate cause of the catastrophe. If they were making a flying switch it does not aid the plaintiff's case, because the intestate was himself "an experienced railroad man and switchman." It was a part of his duty to help in making such switches.

What the yardmaster may have said is immaterial. It is not substantive evidence, but, at most, contradictory. The facts are all before us, so that the Court can itself determine, as matter of law, who caused the death of Moore, without regard to any opinion on that subject from a mere witness. There was no culpable negligence of the defendant railroad company, as it was engaged in its ordinary daily work of shifting cars, and in the usual way. It was not bound to look out for its switchmen, employed in the same work, and who were expected to use care and protect themselves, something they could easily do, if attentive to their work. The case falls directly within the principle of *Aerkfetz v. Humphries, supra.*

As to the damages: The plaintiff cites *Gulf, etc., Railroad Co. v. McGinnis,* 228 U. S., at p. 176, to support a distributive, or apportioned, verdict, but it does not do so, and if it did, the latter case of *Central Vt. R. R. Co. v. White,* 238 U. S., 507, disapproves such a verdict, deciding that the distribution, or apportionment, of the fund to be recovered *in solido* is for the probate courts of the particular jurisdiction, and not for the jury to make. The Court says: "The Employers' Liability Act is substantially like Lord Campbell's Act, except that it omits the requirement that the jury should apportion the damages. That omission clearly indicates an intention on the part of Congress to change what was the English practice so as to make the Federal statute conform to what was the rule in most of the States in which it was to operate. Those statutes, when silent on the subject, have generally been construed not to require juries to make an apportionment. Indeed, to make them do so would, in many cases, double the issues; for, in connection with the determination of negligence and damages, it would be necessary also to enter upon an investigation of the domestic affairs of the deceased—a matter for probate courts and not for jurors." That case was cited in *Horton v. R. R.,* 175 N. C., at p. 488.

For the foregoing reasons, we dissent from the conclusion of the Court in this case.

BROWN, J., concurring in dissent.